JACK EPSTEIN, demandante y recurrido, *v.* F. & F. MORTGAGE CORP. y SEYMOUR TREPEL, demandados y recurrentes; JACK EPSTEIN, demandante y recurrido, *v.* YORK MORTGAGE CORP. y SEYMOUR TREPEL, demandados y recurrentes.

*Número:* R-71-266      *Resuelto:* 21 de septiembre de 1977

*Rodríguez Maduro & Torres Vilá y William B. Graves,* abogados de los recurrentes; *Alfonso Miranda Cárdenas, Angel R. de Corral, Guillermo Silva Janer y Ernesto F. Rodríguez Surís,* abogados del recurrido.

EL JUEZ ASOCIADO SEÑOR MARTÍN emitió la opinión del Tribunal.

▊ Se cuestiona en este recurso la procedencia en derecho de los remedios concedidos por el tribunal de instancia ante una solicitud para la disolución y el nombramiento de síndico instada por uno de los dos socios accionistas de las corporaciones demandadas, F. & F. Mortgage Corp. y York Mortgage. Por entender que un decreto de disolución y sindicatura es un remedio que debe ser utilizado en situaciones excepcionales acordamos revisar, para examinar si las circunstancias particulares de este caso justifican tal remedio.

En marzo de 1963, el demandante Jack Epstein y el codemandado Seymour Trepel visitaron Puerto Rico con un tercero de nombre Sam Cohen con el propósito de establecer un negocio de financiamiento en la isla. Acordaron éstos que la aportación de Cohen y la del demandante Epstein en acciones del proyectado negocio sería de $100,000.00 cada uno, mientras que la del codemandado Trepel sería de $50,000.00. A mayo de 1963, Epstein había aportado la suma de $85,000. Compró entonces la participación de Cohen, ascendente a $100,000.00. Hasta entonces Trepel no había hecho la inversión a que se había comprometido para la compra de acciones, y no fue hasta julio 8 del mismo año que aportó $50,000.00. En múltiples ocasiones Trepel se comprometió a hacer una aportación mayor, pero nunca se materializó. Así las cosas, Epstein y Trepel convinieron en que el primero reduciría su inversión a la suma de $50,000, mediante retiros de dinero para igualar la inversión de capital de cada uno. La reducción se efectuó en agosto de 1964.

Epstein fue entonces designado Presidente de ambas corporaciones, F. & F. Mortgage Corporation y York Mortgage Corporation, que se componían de Epstein y Trepel como

únicos accionistas. El demandante Epstein intervenía en todas las negociaciones bancarias y se ocupaba de todos los arreglos financieros. Gestionó y garantizó personalmente todos los préstamos bancarios de ambas corporaciones. El codemandado Trepel por su parte administraba la oficina y realizaba todo otro tipo de gestión corporativa, manteniendo bajo su control todos los libros de contabilidad que conservaba en su residencia en Long Island, a pesar de que las oficinas principales de las corporaciones estaban ubicadas en el edificio First Federal Savings de Santurce. Como consecuencia de ello, Epstein nunca tuvo acceso a los libros de actas.

A la fecha en que el tribunal de instancia dictó sentencia, esto es, para septiembre de 1971, tanto Epstein como Trepel tenían invertido en las dos corporaciones antes mencionadas la cantidad de $73,426.99 cada uno. Esta cifra se compone de los $50,000.00 que cada uno invirtió originalmente más una aportación subsiguiente de $23,426.99 efectuada para agosto de 1965, por requerimiento del Banco Crédito para satisfacer una obligación.

El tribunal de instancia a base de la prueba que tuvo ante sí, concluyó que las relaciones personales entre el demandante y el demandado nunca fueron cordiales. Las desavenencias comenzaron al negarse Trepel a hacer la aportación total prometida y continuaron agravándose hasta la fecha en que Epstein radicó la demanda objeto de este pleito en septiembre de 1965. Las circunstancias reinantes entre ellos pueden resumirse en la forma siguiente: Trepel desconfiaba del contador de las empresas, Morris Landsman. Epstein descubrió que la esposa del codemandado Trepel había hecho cuatro o cinco viajes a Puerto Rico con cargo a la compañía pero no pudo localizar el expediente de gastos por estar éste en posesión de Trepel fuera de Puerto Rico, junto al libro mayor de la corporación. En ocasión de una fiesta de Navidad para agasajar a los asociados de las empresas, Trepel insultó a Epstein en presencia de los asociados y clien-

tes. Para el mes de marzo de 1965 las partes en este litigio acordaron que se llevaría a cabo una liquidación lenta de las operaciones de F. & F. Mortgage, aunque continuarían operando el negocio de York Mortgage.

A partir de marzo de 1965 Trepel tomó control absoluto de las corporaciones y de todos los bienes de las mismas y comenzó a actuar en forma festinada con los bienes de la corporación, pretendiendo disponer de ciertas hipotecas que pertenecían a York Mortgage, mediante cesión a Meca Mortgage, lo que no pudo materializarse al negarse Epstein a prestar su firma. En agosto 19 de 1965 Trepel notificó al Banco Crédito que la firma de Epstein no era ya necesaria para girar cheques y en agosto 30 le notificó a Epstein su destitución como Presidente, como resultado de una reunión celebrada en Long Island, sin el conocimiento de Epstein y sin que se cumpliera con los requisitos de ley. Trepel intentó vender sin autorización debida, todo el mobiliario de las corporaciones a Consolidated Mortgage, transacción que quedó sin efecto al devolver Trepel el pago al comprador. Finalmente Trepel procedió a suspender todos los servicios que se le prestaban a las corporaciones en operación, cerró las oficinas y despidió a los empleados de las empresas. A tal extremo llegaron las desavenencias entre estos dos socios que desde el 16 de agosto de 1965 ni siquiera se hablaban el uno al otro. [1]

Es dentro del contexto de la situación señalada que Epstein radica su demanda ante el Tribunal Superior en 11 de septiembre de 1965, en la que solicitaba que se ordenara al codemandado Trepel a poner los libros corporativos a su disposición, y a expedir los correspondientes certificados de acciones, y pidiendo que se decretara la disolución de las corporaciones. Mediante solicitud de aseguramiento de sentencia el demandante alegó que la corporación se encontraba en

---

[1] Esto surge de las conclusiones de hecho del tribunal de instancia.

inminente peligro de insolvencia como consecuencia de la administración de Trepel y de la negativa de éste a rendir cuentas y solicitó el nombramiento de un síndico a tenor con lo dispuesto en la Regla 56.6 de las de Procedimiento Civil y el Art. 182 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 851. (²)

Luego de varios incidentes procesales y la celebración de una vista, el tribunal accedió a la solicitud del demandante, nombró como síndico al Lic. Roberto J. Matos mediante Resolución de 13 de enero de 1966 en la que se enumeraron sus funciones. Luego de ventilarse el caso en sus méritos, se declaró con lugar la solicitud de disolución de las empresas corporativas York Mortgage Corporation y F. & F. Mortgage Corporation y a tales efectos se nombró un síndico liquidador, con todas las obligaciones que dispone la Ley de Corporaciones, y se impuso a Trepel el pago de la sindicatura.

## I

El codemandado Trepel nos señala varios errores, pero el que consideramos central para la disposición final del caso constituye un ataque a la apreciación de la prueba en cuanto al número de acciones que tenía cada uno de los dos accionistas de las aludidas corporaciones.

■ Aunque los certificados de acciones presentados demuestran que Trepel es dueño de 165 acciones y Epstein de

---

(²) (a) La Regla 56.6 dispone:

"No se nombrará ningún síndico a menos que se demostrare que ningún otro remedio provisional sería efectivo para asegurar la efectividad de la sentencia. A menos que el Tribunal lo ordenare de otro modo, un síndico actuará según las reglas para la administración judicial de sucesiones."

(b) En 32 L.P.R.A. sec. 851 se dispone que:

"Un síndico podrá ser nombrado por la corte en que un pleito esté pendiente o se haya fallado, o por el juez de dicha corte:

. . . . . . . .

4) En los casos en que una corporación haya sido disuelta, o se hallare insolvente, o en inminente peligro de insolvencia, o hubiere perdido sus derechos como tal corporación."

135, Epstein presentó prueba para demostrar que los referidos certificados habían sido firmados por él en blanco, y de que las cifras indicativas del número de acciones habían sido insertadas luego por Trepel para favorecer su posición. El testimonio del perito calígrafo, aunque reveló varias anomalías, tales como el uso de tres bolígrafos distintos, y escritos de distintas fechas, no pudo esclarecer la controversia entre las versiones contradictorias de las partes, y especialmente si los certificados habían sido llenados antes o después de haber sido firmados por Epstein. En vista de ello el juez de instancia dirimió el conflicto en la prueba al favorecer la versión del demandante. Un examen de la transcripción de la evidencia y de la prueba documental presentada nos persuade de que debemos sostener la conclusión del juez de instancia. Es norma reiterada que no debemos intervenir con las determinaciones de hecho del juzgador a no ser que se haya cometido un grave error. Regla 43.1 de las de Procedimiento Civil; véanse: *Soc. de Gananciales* v. *Soc. de Gananciales*, 104 D.P.R. 50, 53 (1975); *Rodríguez* v. *Concreto Mixto*, 98 D.P.R. 579, 593 (1970).

Nos confrontamos con la realidad de que el demandante y el demandado poseen las acciones de ambas corporaciones de por mitad. Ninguno de ellos tiene el control necesario para hacer determinaciones unilaterales. Los conflictos existentes entre ellos parecen insalvables. No parecería justo que no hubiera un medio para zanjar sus posiciones encontradas sin que continuaran indefinidamente atados en la indivisión por la mera ficción corporativa. Examinemos las disposiciones de ley aplicables, y de ser éstas insuficientes para resolver el problema planteado, acudiremos a lo provisto en otras jurisdicciones que no sea incompatible con nuestro Derecho.

La Ley de Corporaciones, 14 L.P.R.A. sec. 1101 y ss., no provee para la disolución de una corporación por los motivos presentes en el caso de autos. Unicamente prevee dos situaciones que permitirían la disolución después del pago del capital

y del comienzo de la gestión corporativa. Ver: 14 L.P.R.A. secs. 2003, 2010. La primera consiste de una disolución voluntaria con la aprobación de los tenedores de 2/3 partes de las acciones del capital corporativo. La segunda situación surge involuntariamente con la intervención del Secretario de Justicia a iniciativa propia o a instancia de parte por razón de abuso, mal uso o desuso de las facultades, privilegios, o franquicias corporativas. Ninguno de dichos preceptos estatutarios es aplicable a las circunstancias presentes en el caso de autos.

En otras jurisdicciones se encuentran remedios diversos para la disolución tanto voluntaria como involuntaria. En algunas jurisdicciones se autoriza la disolución involuntaria mediante acción instada por un accionista, bien fuere minoritario o mayoritario. [3] Este remedio resulta de utilidad para resolver los problemas que surgen por discrepancias irreconciliables entre grupos igualmente divididos dentro de una corporación cerrada. Pueden aducirse, entre otros, los siguientes fundamentos para pedir la disolución: 1) que los objetivos de la corporación han fracasado, o han sido abandonados; 2) que las actuaciones de los directores, o de aquellas personas que están a cargo de la corporación son ilegales, opresivas o fraudulentas; [4] 3) que los directores han llegado a un *impasse* en la administración de la corporación, sin que los accionistas puedan remediar dicho estancamiento, y por consiguiente la corporación está sufriendo daños irreparables o está amenazada a ello. [5]

[3] O'Neal, *Close Corporation*, Vol. 2, sec. 928.

[4] Véase: *Gidivitz* v. *Lanzit Corrugated Box Co.*, 170 N.E.2d 131 (1960), que resolvió que el privar a un accionista tenedor del 50% de las acciones de su derecho a participar en la administración de la corporación constituye opresión que justifica ordenar la disolución de la corporación.

[5] O'Neal, *supra*. Véanse: Pa. Stats. Anno. Tit. 15, sec. 2107; Minn. Stats. Anno., sec. 301.49; Nev. Rev. Stats., sec. 78:650; Ohio Rev. Code Anno., sec. 1701; Del. Code Anno., Tit. 8, secs. 226, 352 (1968); Cal. Corp. Code, sec. 1800(b).

Las anteriores disposiciones estatutarias evidencian un interés de proteger a accionistas minoritarios o aun mayoritarios que no disponen del número de acciones requeridas para la disolución voluntaria, pero cuyos intereses se ven adversamente afectados al concurrir alguna o todas las circunstancias enumeradas.

Aunque la regla general en el Derecho corporativo es al efecto de que en ausencia de estatuto aplicable las cortes no tienen jurisdicción para disolver una corporación [6] se han ido creando múltiples excepciones a la regla general, que ha restado importancia a la cuestión jurisdiccional y el énfasis se está moviendo hacia las circunstancias particulares de cada caso que puedan ameritar la intervención de los tribunales [7] para proveer el remedio procedente. Así un sinnúmero de tribunales han estimado conveniente aplicar a corporaciones cerradas las mismas reglas de disolución que rigen con respecto a las sociedades, equiparando a estos efectos la corporación con la sociedad. Véanse: Hornstein, *Corporation Law & Practice*, Vol. 2, sec. 816; *Flemming* v. *Heffner & Flemming*, 248 N.W. 900 (1933); *Bowen* v. *Bowen*, 217 P. 301 (1923).

En una corporación cerrada se requiere un alto grado de confianza y colaboración entre los accionistas. Estos no tienen las ventajas que tendría un socio en una corporación pública ya que de no encontrarse satisfecho no hay un mercado que permita fácilmente disponer de sus acciones y en muchas ocasiones existen restricciones para el traspaso de acciones. Como muy bien señalan los comentaristas, las discrepancias existentes entre los dirigentes en una corporación cerrada normalmente tienen un efecto detrimental en las

---

[6] Véanse: *Turner* v. *Flynn & Errich Co.*, 306 A.2d 218 (1973); y *Homond* v. *Homond*, 216 S.W. 630 (1948).

[7] Véase: Carlos L. Israels, *The Sacred Cow of Corporate Existence, Problems of Deadlock and Dissolution*, 19 U. Chi. L. Rev., págs. 778, 793 (1952).

operaciones del negocio. Forzar la continuidad de una corporación bajo esas circunstancias podría conllevar la pérdida de los activos y quizás la insolvencia de la corporación. Aunque tal continuidad podría ser saludable para las corporaciones públicas, es indeseable para una corporación privada. ([8])

Los problemas peculiares que afectan el funcionamiento de las corporaciones cerradas han obligado a varios Estados a aprobar legislación para remediarlos. A estos efectos véanse los Estatutos de Florida, North Carolina, New York y Delaware; ([9]) y *Dissolution of the Close Corporation*, 41 St. John's L. Rev., págs. 239–255 (1966).

En Puerto Rico, el caso de *Rosales Cueli et al. v. Cartagena et al.*, 39 D.P.R. 876 (1929), resolvió que aunque deben cumplirse las disposiciones de ley sobre la disolución de una corporación, puede surgir una situación de conflicto tal entre los directores, que obligue a recurrir ante los tribunales para resolverlo. ([10]) En *Rosales Cueli* se produjo una situación que envolvía dificultades surgidas en la administración de la corporación, disgustos entre sus directores, pérdidas sufridas y una serie de ocurrencias demostrativas de la imposibilidad de que los negocios continuaran guiados por la Junta Directiva que a su cargo los tenía. Allí un grupo de accionistas que poseían la mitad de las acciones solicitaron la disolución de la corporación y el nombramiento de un síndico liquidador. El tribunal, fundado en el estado de cosas existente, que hacía imposible seguir el trámite marcado por la ley para la disolu-

---

([8]) *Id.* pág. 789; véase también Daniel H. O'Connell, *Dissolution as a Remedy for Dissension and Deadlock in the New York Closely-Held Corporation*, 19 Buffalo L. Rev., págs. 585–598 (1969).

([9]) Fla. Stat. Ann., secs. 608.0100–.0107; N.Y. Bus. Corp. Law, *supra.* (McKinney 1963) sec. 1111 y sec. 1104; Del. Code Ann., *supra.*

([10]) El Art. 7 del Código Civil de Puerto Rico provee en su parte pertinente: "Cuando no haya ley aplicable al caso, el tribunal resolverá conforme a equidad, que quiere decir que se tendrá en cuenta la razón natural de acuerdo con los principios generales del derecho, y los usos y costumbres aceptados y establecidos."

ción voluntaria, accedió a las pretensiones de los demandantes. (<sup>11</sup>)

■ Toda vez que la Ley General ·de Corporaciones no prohíbe la disolución por la vía judicial de una corporación, a la luz de los hechos presentes en el caso de autos y a tenor con el espíritu de equidad dimanante del Art. 7 del Código Civil de Puerto Rico, resolvemos que el tribunal de instancia actuó correctamente al disolver las corporaciones demandadas. (<sup>12</sup>) Por los mismos fundamentos procede también el nombramiento de un síndico en aseguramiento de sentencia. Es evidente que por razón de las discrepancias irreconciliables entre los únicos dos socios accionistas, la corporación estaba abocada a una crisis, cuyos resultados son fáciles de predecir. Las conclusiones de hecho ·del tribunal de instancia revelan que mientras Trepel realizaba ciertas gestiones, Epstein se movía para deshacerlas. Es forzoso concluir que las circunstancias especiales presentes en este caso y la posibilidad de insolvencia constituían una amenaza constante que justificaba la disolución de la corporación y el nombramiento de un síndico liquidador. 32 L.P.R.A. sec. 851. (<sup>13</sup>)

La Ley General de Corporaciones, en lo que es aquí pertinente, expresa lo siguiente:

"Cuando de cualquier modo se disolviere alguna corporación creada con arreglo a las leyes del Estado Libre Asociado, si se probare que la corporación no puede pagar sus deudas al venci-

---

(<sup>11</sup>) Para un comentario sobre la deseabilidad de la regla aquí enunciada véase, Greenwood, *Corporations—Receivership and Dissolution as Remedies for Management Deadlock,* 47 Mich. L. Rev., pág. 684 (1949).

(<sup>12</sup>) En su misión de impartir justicia y a falta de disposiciones estatutarias controlantes este Tribunal en numerosas ocasiones ha recurrido a aquellos preceptos generales del derecho contenidos en el referido Art. 7 del Código Civil. Véanse *Silva* v. *Comisión Industrial,* 91 D.P.R. 891 (1965) ; *Piovanetti Doumont* v. *Martínez,* 99 D.P.R. 663 (1971).

(<sup>13</sup>) Véanse Regla 56.6 de Procedimiento Civil y 32 L.P.R.A. sec. 851; *Guaranty Laundry Co.* v. *Pulliam,* 191 P.2d 975 (1948) ; *Saltz* v. *Saltz Bros.,* 84 F.2d 246 (1936) ; *Drob* v. *National Memorial Park,* 41 A.2d 589 (1945).

miento de éstas, o se la está administrando fraudulentamente, o se están malgastando o distribuyendo impropiamente sus activos, o no se está dando la debida atención a sus asuntos, el Tribunal Superior, a instancia de cualquier acreedor o accionista de la corporación, y en cualquier momento, podrá nombrar síndico a uno o varios directores de la corporación, o administrador judicial de ésta a una o varias personas, para que tales síndicos o administradores judiciales se hagan cargo del patrimonio corporativo y cobren los créditos y recobren los bienes de la corporación. Los síndicos y administradores judiciales tendrán facultad para representar judicialmente a la corporación o actuar de otro modo con respecto a todos los pleitos que fueren necesarios o propios a los fines antedichos; y tendrán asimismo facultades para nombrar agentes bajo sus órdenes, y para realizar todos los demás actos que la corporación realizaría si existiere, y que sean necesarios para la liquidación final de los asuntos corporativos pendientes. Podrán prorrogarse las facultades de los síndicos o administradores judiciales por el tiempo necesario y mediante las órdenes necesarias, a juicio del Tribunal, para los fines antedichos.—Enero 9, 1956, Núm. 3, p. 104, art. 1007." 14 L.P.R.A. sec. 2007.

Nótese que la sección transcrita concede al Tribunal Superior facultad para, a instancias de cualquier acreedor o accionista de la corporación y en cualquier momento, nombrar administrador judicial de una corporación a una o varias personas para hacerse cargo del patrimonio corporativo y cobrar los créditos y recobrar los bienes de la corporación, con todos los atributos y facultades que dicho precepto legal confiere si se probare a satisfacción del tribunal, entre otras, cualquiera de las siguientes circunstancias:

1) Que se está malgastando o distribuyendo impropiamente los activos de la corporación; o

2) Que no se está dando la debida atención a los asuntos de la corporación.

Las conclusiones de hecho del tribunal de instancia especialmente las relacionadas con la forma festinada en que Trepel actuaba con los bienes de la corporación, intentando disponer de hipotecas, cheques y bienes muebles de las corpo-

raciones demandadas sin autorización para ello, revelan la existencia de dos de las condiciones requeridas por la Sec. 2007 que justifican el nombramiento de un síndico liquidador o administrador judicial.

## II

■ Finalmente, debemos considerar si erró el tribunal de instancia al imponerle las costas en forma solidaria al demandado Trepel conjuntamente con las dos corporaciones demandadas. No tenemos duda de que el pleito fue instado por motivo de la conducta temeraria del codemandado Trepel al negarse a acceder a la liquidación voluntaria de las corporaciones aludidas. Debe ser éste pues responsable del pago de las costas en su totalidad.

■ En cuanto a los gastos de la sindicatura, éstos deben ser prorrateados entre ambas corporaciones en la proporción en que éstos aparecen en el memorando de costas presentado por la parte demandante, y los mismos deducidos en partes iguales de las sumas que corresponden a los accionistas Epstein y Trepel en la liquidación de ambas corporaciones, a la luz de lo dispuesto en la Sec. 2011 [14] de la Ley General de Corporaciones, y de lo preceptuado en nuestro Código de Enjuiciamiento Civil [15] en cuanto a la remuneración de administradores y albaceas al efecto de que los bienes bajo su administración responderán por los gastos incurridos para la preservación de éstos. Y, es lógico que así sea pues la función de un síndico es primordialmente la de administrar y conservar los bienes que le han sido encargados. Tales gastos fueron incurridos por el síndico en el descargo de la misión impuéstale por el tribunal, por lo que éste tiene facultad para determinar que el costo de la sindicatura recae sobre ambas corporaciones. La parte demandante alega que los gastos de una

---

[14] 14 L.P.R.A. sec. 2011.

[15] 32 L.P.R.A. sec. 2491.

primera sindicatura, que luego fue declarada nula por haber recaído la designación sobre un síndico en forma ex-parte, deben correr por cuenta del promovente del pleito. Normalmente, ése debía ser el resultado. Sin embargo, no se nos ha demostrado que los gastos incurridos por dicha primera sindicatura fueran excesivos, innecesarios o indebidos. Por ello deben recaer también sobre las dos corporaciones objeto de la sindicatura.

## III

■ Mediante reconvención, el demandado Trepel hizo una reclamación de daños contra Epstein imputándole violación a sus deberes de fiducia para con las corporaciones demandadas consistente en haber creado entidades corporativas que entrarían en competencia abierta con York Corporation y F. & F. Mortgage Corporation. No hay duda de que existe una relación de fiducia entre un director y la corporación, por lo que no debe tal oficial asumir posiciones contrarias a los intereses de la corporación. Sin embargo y a pesar de la naturaleza del puesto que ocupa, un director no está impedido de entrar en negocios similares, siempre que actúe de buena fe y se abstenga de interferir con los negocios de la corporación, especialmente cuando no existe un acuerdo de no competir. *Renpak, Inc.* v. *Oppenheimer*, 104 So.2d 642 (1958); *Raines* v. *Toney,* 313 S.W.2d 802 (1958); 64 A.L.R. 784. El Estado de Delaware también ha adoptado el mismo principio, concediéndole amplia libertad a oficiales y directores de una corporación para desarrollar todo tipo de negocio. *Craig* v. *Graphic Arts Studio, Inc.*, 166 A.2d 444 (1960).

Toda vez que no se presentó evidencia convincente de que el nuevo negocio organizado por Epstein perjudicare en forma alguna a la F. & F. Mortgage Corp. o a la York Corp., y tomando en cuenta que desde marzo de 1965 (6 meses antes de organizarse las nuevas corporaciones) las corporaciones demandadas habían abandonado los negocios de segundas hipotecas que hubieran podido ser afectados por la compe-

tencia de los nuevos negocios de Epstein, concluimos que el Tribunal Superior actuó correctamente al declarar sin lugar la reconvención.

*Se modificará la sentencia dictada el 29 de septiembre de 1971 en el caso de Jack Epstein v. F. & F. Mortgage Corp. y Seymour Trepel, civil número CS-65-3980, a los únicos efectos de imponer las costas del procedimiento al codemandado Trepel, con exclusión de las dos corporaciones demandadas, y prorratear los gastos de la sindicatura entre las corporaciones demandadas F. & F. Mortgage Corp. y York Mortgage Corporation según se especifican en el Memorando de Costas sometido por la parte demandante. Así modificada se confirmará.*

El Juez Asociado Señor Rigau no intervino.