La Jueza Asociada Señora Fiol Matta
emitió la opinión del Tribunal.
Este caso nos brinda la oportunidad de analizar la fi-gura de la “empresa común” o joint venture establecida por la Ley General de Corporaciones de 1995. En particular, interpretaremos por primera vez el Artículo 9.03 de dicha ley, que provee para la disolución de corporaciones com-puestas por dos accionistas que por partes iguales se dedi-can a la realización de una empresa común. Por las razo-nes que ofrecemos a continuación, confirmamos la determinación del Tribunal de Apelaciones.
HH
El 2 de agosto de 2006, el Sr. José C. Lloréns presentó una demanda ante el Tribunal de Primera Instancia contra el Sr. Rafael Arribas al amparo del Artículo 9.03 de la Ley General de Corporaciones de 1995 (14 L.P.R.A. see. 3003 (ed. 2008)), solicitando la disolución de la corporación Pharmaceutical Generics Developers, Inc. (P.G.D.).(1) Llo-réns y Arribas son los únicos accionistas de P.G.D. y cada uno posee el 50 por ciento de las acciones de dicha corporación. P.G.D. es una corporación que se dedica a la venta y distribución de productos farmacéuticos genéricos. Según Lloréns, entre él y Arribas existen diferencias signi-ficativas que provocan un tranque que impide la operación de la empresa, por lo que procede la disolución del ente corporativo conforme al Artículo 9.03.(2)
*36 Lloréns solicitó que se dictara sentencia sumaria a su favor, argumentando que no había controversia real sobre los hechos materiales siguientes: (1) que P.G.D. es una cor-poración organizada al amparo de las leyes de Puerto Rico, (2) que Arribas y él son los únicos accionistas de P.G.D., cada cual con el 50 por ciento de las acciones y (3) que existen desavenencias entre ellos que han provocado un tranque insalvable.(3) Por su parte, Arribas y P.G.D. sostie-nen que el Artículo 9.03 no aplica a P.G.D. en la medida que ésta no podía considerarse una “empresa común”, (4) uno de los requisitos para que se pueda poner en vigor dicho artículo. Por lo tanto, solicitaron la desestimación de la demanda por no justificarse la concesión de un remedio. De igual forma, la parte demandada se opuso a la moción de sentencia sumaria presentada por Lloréns alegando que, de aplicar el Artículo 9.03, había controversia real so-bre varios hechos que considera materiales; entre estos: (1) si Arribas fue empleado de Lloréns, (2) la cantidad de capital aportado por cada uno cuando se incorporó P.G.D., (3) si existen controversias insalvables entre los accionistas, (4) si P.G.D. está operando actualmente, (5) las razones para el alegado tranque y (6) si P.G.D. se creó como una corporación para una sola transacción o gestión comercial.(5)
El Tribunal de Primera Instancia declaró “sin lugar” la moción de sentencia sumaria presentada por Lloréns por entender que había controversia sobre hechos materiales del caso. De igual forma, declaró “sin lugar” la moción de desestimación presentada por Arribas y P.G.D. Si bien co- *37 incidió con la parte demandada en que P.G.D. no era una corporación dedicada a una empresa común y, por ende, la controversia no se regía por el Artículo 9.03, el foro de ins-tancia concluyó que, según el estándar de una moción de desestimación en la que se argumenta que no se configura una causa de acción que justifique la concesión de un re-medio, el caso debía continuar, ya que Lloréns podía tener derécho a otro remedio en ley que no fuera el establecido en el Artículo 9.03.(6)
Ambas partes acudieron al Tribunal de Apelaciones. Lloréns alegó que procedía dictar sentencia sumaria y la disolución de P.G.D., conforme al Artículo 9.03 de la Ley General de Corporaciones. A su vez, Arribas y P.G.D. ale-garon que, una vez resuelto que el Artículo 9.03 no apli-caba, se debió haber desestimado el caso, ya que la solici-tud de disolución se fundamentaba en dicha disposición. Tras consolidar ambos recursos, el foro apelativo revocó al Tribunal de Primera Instancia.
Según el Tribunal de Apelaciones, no había controversia real en cuanto a los hechos materiales del caso. Concluyó de entrada que la única controversia de hechos respecto a la acción al amparo del Artículo 9.03 de la Ley General de Corporaciones se centraba en el requisito de que la corpo-ración se dedique al logro de una empresa común (joint venture).(7) El Tribunal de Apelaciones razonó que hay dos posibles definiciones de lo que constituye una empresa co-mún al amparo del Artículo 9.03. Una posible definición es que la corporación se crea para efectuar una sola transac-ción comercial. La segunda posibilidad, de corte más am- *38 plio, incluye aquellas entidades que se dedican a un nego-cio continuo que trasciende una única transacción, como sucede en el caso de P.G.D., que se dedica a la venta de productos farmacéuticos. El foro apelativo acogió la se-gunda alternativa,(8) al razonar que la decisión en Planned Credit of P.R., Inc. v. Page,(9) limitando la “empresa co-mún” a la realización de “una sola transacción”, no rige en la presente situación, pues ese caso fue resuelto antes de que la Ley General de Corporaciones de 1995 codificara dicha figura por primera vez. Según el Tribunal de Apela-ciones, la interpretación ofrecida por Arribas y P.G.D. “con-llevaría llegar al resultado irrazonable de que la intención legislativa fue promulgar una disposición tan limitada que aplica solamente a corporaciones organizadas para efec-tuar una única transacción comercial”.(10) Al no haber con-troversia en cuanto a que P.G.D. era una corporación dedi-cada únicamente a la venta y distribución de fármacos genéricos, y dado que los demás hechos controvertidos por la parte demandada no están relacionados con los requisi-tos del Artículo 9.03, el Tribunal de Apelaciones dictó sen-tencia sumaria ordenando la disolución de P.G.D. y devol-vió el caso al Tribunal de Primera Instancia para que continuara con el proceso establecido en el Artículo 9.03.
Inconformes, Arribas y P.G.D. presentaron un recurso de certiorari ante este Tribunal. En su petición, se reafir-man en que P.G.D. es un negocio que lleva a cabo múltiples gestiones comerciales y tiene una existencia continua, por lo cual no constituye una empresa común según la defini- *39 ción adoptada en Planned Credit y no puede disolverse si-guiendo el procedimiento pautado en el Artículo 9.03. Ade-más, alegan que el foro apelativo erró al ordenar sumariamente la disolución de P.G.D. pues ese no era el procedimiento dispuesto por dicho artículo.
Arribas y P.G.D. nos refieren a nuestra decisión en Planned Credit, que, según exponen, definió los contornos de la “empresa común” como una entidad que realiza una única transacción y tiene un fin específico y restringido, por lo que no puede tener naturaleza continua. Por lo tanto, sostienen que el Tribunal de Apelaciones erró al re-currir a la normativa de Delaware para adoptar una defi-nición distinta y más abarcadora de dicha figura. Según los peticionarios, P.G.D. no es una empresa común porque se dedica al negocio de venta y distribución de fármacos ge-néricos a perpetuidad y no a un fin específico y restringido, es decir, a una sola transacción. En particular, alegan que la definición amplia adoptada por el Tribunal de Apelacio-nes convierte en una empresa común a toda corporación regular compuesta por dos accionistas que sean dueños, cada cual del 50 por ciento de las acciones. Arguyen que, en ese caso, no tendría sentido el Artículo 9.03. Por lo tanto, Arribas y P.G.D. plantean que, cuando la Asamblea Legis-lativa hizo mención a la “empresa común” en el Artículo 9.03, sin ofrecer una definición estatutaria de dicha figura, adoptó la definición provista en Planned Credit. Final-mente, los peticionarios alegan que los Artículos de Incor-poración de P.G.D. ni siquiera la limitan a la venta y dis-tribución de medicamentos genéricos, sino que la corporación puede dedicarse a cualquier actividad lícita. Según su criterio, esto impide que pueda catalogársele como empresa común dedicada a una sola transacción o, incluso, a una sola gestión comercial.(11)
*40 En la alternativa, Arribas y P.G.D. insisten en que, aun siendo aplicable el Artículo 9.03, la sentencia sumaria es improcedente, pues hay controversia en cuanto a los he-chos siguientes: (1) la existencia de diferencias insalvables entre Lloréns y Arribas; (2) si P.G.D. se encuentra ope-rando actualmente; (3) las razones para el alegado tran-que, y (4) si P.G.D. se creó como una corporación para una sola transacción comercial o gestión comercial.(12) Según Arribas, si se decide aplicar el Artículo 9.03, lo que corres-pondería sería devolver el caso al foro de instancia para la celebración de una vista en la que se diluciden los hechos señalados. Los peticionarios sostienen que cuentan con va-rias defensas afirmativas que impiden la disolución suma-ria de P.G.D. En particular, aducen que la petición de diso-lución constituye un incumplimiento de los deberes de fiducia de Lloréns hacia P.G.D.(13) De igual forma, Arribas y P.G.D. alegan que Lloréns tiene otra corporación que es competidora de P.G.D. y no se debe permitir que éste logre la disolución de P.G.D. para engrosar las arcas corporati-vas de su otra empresa.(14)
Por su parte, Lloréns alega que procede la disolución de P.G.D., pues están presentes todos los elementos y se han cumplido todos los pasos requeridos por el Artículo 9.03. Sostiene que P.G.D. debe considerarse una empresa co-mún, incluso según la definición de Planned Credit, pues nuestra decisión en ese caso realmente no limita la em-presa común a una sola transacción. En particular, alega que en aquel caso nos equivocamos al traducir la frase “single business enterprise” —utilizado en la doctrina de Estados Unidos— como “una sola transacción”. Lloréns *41 sostiene que P.G.D. cae bajo la categoría de un “single business enterprise”, ya que se dedica únicamente a la venta y distribución de medicamentos genéricos.(15) Arguye, ade-más, que, si las corporaciones dedicadas al logro de una empresa común tienen, por definición, que dedicarse a “una sola transacción”, el procedimiento de disolución pro-visto por el Artículo 9.03 sería innecesario porque no ha-bría nada que disolver, como tampoco se daría una desave-nencia entre los accionistas sobre la continuación de unas operaciones que, por definición, nunca serían continuas. En la alternativa, alega que, aun si no aplicara el Artículo 9.03, procede la disolución de P.G.D. como remedio en equi-dad, según nuestras expresiones en Epstein v. F. & F. Mortgage Corp.(16)
En cuanto a la sentencia sumaria, Lloréns alega que el Artículo 9.03 es, precisamente, un procedimiento sumario de disolución de una corporación. Por lo tanto, una contro-versia de hecho será material a una demanda según el Ar-tículo 9.03 si trata sobre uno de los cuatro requisitos enu-merados en dicho estatuto, a saber: si P.G.D. es una corporación organizada al amparo de las leyes de Puerto Rico; si está compuesta por dos accionistas, cada uno con el 50 por ciento de las acciones; si se dedica al logro de una empresa común y si existen desavenencias entre los accio-nistas sobre la deseabilidad de descontinuar las operaciones. Por lo tanto, Lloréns concluye que cualquier controversia sobre las razones para las desavenencias es impertinente. De igual forma, como no hay controversia de hecho sobre las operaciones de P.G.D., sólo resta estimar, como cuestión de derecho, si dichas operaciones caen bajo *42 el significado de “empresa común”. De estimarse que P.G.D. es una empresa común, procede su disolución inmediata. El 11 de diciembre de 2009, expedimos el auto de certiorari. Las partes han comparecido y pasamos a resolver.
II
El Artículo 9.03 de la Ley General de Corporaciones de 1995 establece un mecanismo expedito para la disolución de corporaciones dedicadas a una empresa común compuestas por dos accionistas con igual cantidad de acciones:

See. 3003. Disolución de una corporación de empresa común de dos accionistas.

(a) Si los accionistas de una corporación organizada con arreglo a las leyes del Estado Libre Asociado de Puerto Rico, que tenga sólo dos (2) accionistas, cada uno de los cuales posea el cincuenta por ciento (50%) de las acciones de la misma, se dedicasen al logro de una empresa común (joint venture), y si tales accionistas no pudiesen llegar a un acuerdo en torno a la deseabilidad de descontinuar tal empresa común y para dispo-ner de los activos utilizados en dicha empresa, cualquiera de dichos accionistas podrá radicar en el Tribunal de Primera Instancia (Sala Superior) una petición en la que consigne que desea descontinuar tal empresa común y disponer de los acti-vos utilizados en tal empresa de acuerdo con el plan que am-bos accionistas acuerden; o que, si no pudiesen ambos accio-nistas acordar dicho plan, la corporación queda disuelta. La petición deberá acompañarse con una copia del plan de des-continuación y distribución que se propone y una certificación que haga constar que copias de tal petición y plan se han re-mitido por escrito al otro accionista y a los directores y oficia-les de la corporación. La petición y la certificación serán sus-critas y autenticadas según las disposiciones del [Art. 703] de esta ley.
(b) Salvo en el caso en que ambos accionistas presenten ante el Tribunal de Primera Instancia (Sala Superior), dentro de tres (3) meses a partir de la fecha de la radicación de la peti-ción, una certificación simultáneamente suscrita y autenti-cada en donde declaren que han acordado un plan, o una mo- *43 dificación del mismo, y presenten, dentro de un (1) año a partir de la fecha de radicación de tal petición, una certifica-ción suscrita y autenticada en donde declaren que la distribu-ción dispuesta por tal plan se ha completado, el Tribunal de Primera Instancia (Sala Superior) podrá disolver la corpora-ción y podrá administrar y liquidar sus negocios mediante la designación de uno o más síndicos o administradores judicia-les con todas las facultades y títulos de un síndico o adminis-trador judicial designado según el [Artículo 9.09] de esta ley .... (Énfasis suplido.(17)
Como se deduce de lo anterior, para que un tribunal pueda ordenar la disolución de una corporación al amparo del Artículo 9.03, tienen que darse los elementos siguien-tes: (1) que se trate de una corporación organizada con arreglo a las leyes de Puerto Rico; (2) que tenga sólo dos accionistas, cada uno con el cincuenta por ciento de las acciones; (3) que se dedique al logro de una empresa co-mún, y (4) que haya un desacuerdo entre los accionistas sobre la deseabilidad de continuar tal empresa común. Es decir, el Artículo 9.03 no aplica a toda corporación com-puesta por dos accionistas en la que cada uno posee la mi-tad de las acciones. Hace falta que dicha corporación se dedique a lograr una “empresa común”. Sin embargo, en ninguna otra parte de la ley se hace referencia al concepto “empresa común”. Tampoco hay una definición estatutaria de esta figura.
Con la aprobación de la Ley General de Corporaciones de 1995 se codificó por primera vez el concepto “empresa *44 común” en nuestro ordenamiento, se le dio forma corpora-tiva y se adoptó un mecanismo estatutario para la disolu-ción de una corporación dedicada a una empresa común. Previo a ello, nuestra jurisprudencia ya había analizado, por separado, tanto la figura de la empresa común como la disolución de corporaciones compuestas por dos accionistas por partes iguales.(18) Sin embargo, precisamente porque son decisiones anteriores a la aprobación del estatuto que estamos llamados a interpretar hoy, tenemos que evaluar y sopesar ambas opiniones con mucha cautela.
En Planned Credit of P.R., Inc. v. Page, al discutir la figura de la sociedad, analizamos la “empresa común” en su manifestación no corporativa.(19) Reconociendo que “a veces resulta difícil distinguir entre una Sociedad y una Empresa Común”, en dicho caso resolvimos que la característica esencial de la empresa común es que se trata de “una operación limitada a una sola transacción [y no] se trata de una asociación convenida para operaciones diversas y de naturaleza continua, sino una con un fin específico y restringido ...”. (Enfasis suplido.)(20)
A primera vista, el dedicarse únicamente a una sola transacción parecería ser una limitación inherente a la fi-gura de la empresa común. Sin embargo, como adelantára- *45 mos, esta definición se limita a la empresa común en su modalidad no corporativa. Además, una mirada más pro-funda a nuestras expresiones en Planned Credit contradice una visión tan estrecha de la empresa común, aun en su modalidad no corporativa. Revisando esas expresiones, nos topamos con que la interrogante que confrontamos en ese caso era si una relación comercial particular entre las par-tes constituía una sociedad o una empresa común, pues, como hemos señalado, la ley de corporaciones vigente en aquel entonces no reconocía que una empresa común pu-diese tener una modalidad corporativa. Por lo tanto, al analizar la distinción entre una sociedad y una empresa común, abordamos esta segunda figura partiendo de su na-turaleza informal, carente de personalidad jurídica y de-más características inherentes a un ente corporativo. En resumidas cuentas, la empresa común de Planned Credit es distinta a la entidad corporativa reconocida en el Artí-culo 9.03.
Para interpretar nuestras expresiones en Planned Credit debemos recurrir a las fuentes doctrinales y norma-tivas en las cuales descansamos, en particular la discusión del tratadista Rowley y su discusión sobre la figura de la empresa común en su modalidad no corporativa.(21) Este tratadista reconoce que la figura de la empresa común no permite una definición satisfactoria,(22) pero ofrece la defi-nición siguiente: “An association of two or more persons to carry out a single business enterprise for profit.” (Enfasis *46 suplido.)(23) La opinión en Planned Credit tradujo esta de-finición y, citando como autoridad a Rowley, definió la em-presa común como: “una operación limitada a una sola transacción.’’(24) Resulta evidente el error, pues “single business enterprise” trasciende los límites de una sola transacción. Por eso, la traducción correcta del enunciado de Rowley es: “Una asociación de dos personas o más para llevar a cabo una empresa de un solo negocio para obtener ganancia.” De esa manera, la empresa común no corpora-tiva se asemeja a una sociedad, pero limitada en su alcance y duración.(25) Igualmente, sus elementos fundamentales son el compartir tanto las ganancias y las pérdidas como el control de la empresa.(26)
Rowley descarta expresamente la limitación de la em-presa común a una sola transacción: “[A] joint adventure is usually, but not necessarily, limited to a single transaction.” (Enfasis suplido.)(27) Es decir, una empresa común puede estar dedicada a una sola transacción, pero no tiene por qué limitarse a ello. Pero incluso en los casos de empresas dedicadas a una sola transacción, dicha transacción no tiene que ser de duración corta, sino que puede tardarse años en concluir.(28) Por lo tanto, la característica esencial de la empresa común no es que la gestión se dedique a una sola transacción. Por el contrario, el elemento fundamental de la empresa común es que tenga un objetivo o fin específico.
Por su parte, el profesor Díaz Olivo discute la figura de la empresa común al abordar el proceso de disolución al *47 amparo del Artículo 9.03. En ese contexto, el profesor pro-pone lo siguiente:
Una empresa común es la realización de una operación co-mercial específica llevada a cabo por dos o más personas. Los empresarios para esta operación o actividad aportan dinero, propiedad, conocimientos o servicios y comparten entre sí las ganancias y el riesgo de la gestión. La figura de la empresa común guarda gran similitud con la sociedad, con la diferencia de que ésta se organiza para operar un negocio de forma continua, mientras que la empresa común lo hace para llevar a cabo una sola transacción o gestión comercial. (Enfasis suplido.)(29)
Es evidente que, en este comentario, Díaz Olivo no se refiere a la empresa común que asume forma corporativa, sino a la que guarda similitud con la sociedad, es decir, la que estudiamos en Planned Credit. Sin embargo, sus ex-presiones reconocen que, aún en ese caso, si bien una em-presa común puede dedicarse únicamente a una sola tran-sacción, también puede dedicarse a realizar una gestión u operación comercial, lo que supone una relación de nego-cios que trasciende la mera transacción. También surge del comentario del profesor Díaz Olivo que el elemento fundamental de la empresa común es que los esfuerzos de la empresa estén dirigidos hacia la obtención de un fin espe-cífico previamente identificado por sus integrantes.
Hemos visto que el Artículo 9.03 de nuestra Ley General de Corporaciones reconoce la empresa común en su moda-lidad corporativa dentro del marco de una corporación compuesta únicamente por dos accionistas por partes iguales. Nuestra jurisprudencia ha atendido la problemá-tica de la disolución de este tipo de corporación cuando se produce un tranque irremediable entre sus accionistas. En Epstein v. F & F Mortgage Corp., al confrontar la realidad de que el demandado y el demandante poseían las acciones de ambas corporaciones por mitad, reconocimos que *48 “[n]inguno de ellos tiene el control necesario para hacer determinaciones unilaterales. Los conflictos existentes en-tre ellos parecen insalvables. No parecería justo que no hu-biera un medio para zanjar sus posiciones encontradas sin que continuaran indefinidamente atados en la indivisión por la mera ficción corporativa”. (Énfasis suplido.)(30) Dado que la ley de corporaciones de 1956, vigente en ese mo-mento, no proveía para la disolución de una corporación en esas circunstancias, recurrimos a la equidad pautada en el Artículo 7 del Código Civil, 31 L.P.R.A. see. 7, y ordenamos la disolución del ente corporativo.(31)
Como explica el profesor Negrón Portillo, “[l]a situación planteada en el caso de Epstein fue atendida por la nueva Ley General de Corporaciones [de 1995] ”.(32) No obstante, como hemos visto, la Ley General de Corporaciones de 1995, al igual que la de 2009, únicamente provee para la disolución judicial cuando las corporaciones compuestas por dos accionistas, cada cual con igual cantidad de acciones, se dedican a una empresa común. Es para esos casos que habrá que recurrir al proceso establecido en el Artículo 9.03 de la Ley General de Corporaciones. Cuando no aplique este artículo, es decir, cuando no se trate de una empresa común, se recurrirá a la doctrina de Epstein.
Si bien Planned Credit y Epstein facilitan nuestra inter-pretación del Artículo 9.03 de la Ley General de Corporaciones,(33) resultan insuficientes. Por un lado, Planned Credit contiene una definición, que ya hemos precisado, de la figura de la empresa común no corporativa. Por otra parte, Epstein atiende la disolución forzosa de corporaciones com-puestas únicamente por dos accionistas por partes iguales. *49 Cada uno atiende una vertiente de la situación aquí plan-teada, pero ninguno de los dos nos brinda la solución en su totalidad. Por eso, en el contexto de una empresa común en forma de corporación, según establecido por la Ley General de Corporaciones, el propio estatuto nos obliga a auscultar otras fuentes. A la misma vez, el desarrollo histórico de la figura de la empresa común también requiere que actuali-cemos nuestro análisis realizado en 1975.
h-H I — I HH
La Ley General de Corporaciones de 1995 es una tra-ducción de la Ley General de Corporaciones de Delaware. En particular, nuestro Artículo 9.03 es un calco de la Sec-ción 237 de dicha ley.(34) Durante la consideración del Pro-yecto del Senado 1122, que eventualmente se convertiría en la Ley Núm. 144, el Informe de la Comisión de Refor-mas Gubernamentales de dicho foro legislativo estableció expresamente el mandato legislativo en cuanto a la inter-pretación de la Ley General de Corporaciones:
Al tomar este camino, expresamos aquí con meridiana cla-ridad la intención legislativa de que, a efectos de la interpre-tación de esta ley, se utilicen como guías los preceptos y normas desarrolladas por la jurisprudencia interpretativa del estado de Delaware. (Enfasis suplido. )(35)
*50 Por eso, ante el silencio legislativo sobre la definición de una empresa común en el contexto corporativo, debemos recurrir a la normativa de Delaware, tanto estatutaria como jurisprudencial.
En cuanto al proceso de disolución corporativa estable-cido en el Artículo 9.03, el informe legislativo indica que: “se dispone para la disolución de una corporación con rela-tiva facilidad, tanto bajo circunstancias especiales como en casos de tranques de corporaciones con sólo dos accionis-tas, como en circunstancias ordinarias cuando los accionis-tas deciden poner fin a las actividades corporativas”.(36) Por lo tanto, también existe un mandato legislativo de in-terpretar el Artículo 9.03 de la Ley General de Corporacio-nes de manera que facilite la disolución de una corporación cuando se produzca un tranque entre dos únicos accionis-tas o cuando así lo soliciten los accionistas en situaciones ordinarias.(37) Por su parte, la Ley General de Corporacio-nes de 2009, que, como hemos visto, mantuvo intacto, en lo pertinente, el Artículo 9.03, preservó la cercanía entre nuestro esquema estatutario y el desarrollo normativo en Delaware en el área de derecho corporativo. En particular, se reafirma la identidad entre nuestro Artículo 9.03 y su análogo en la Ley de Delaware (Sec. 273) sobre la disolu-ción de corporaciones dedicadas a una empresa común compuesta por dos accionistas con igual cantidad de acciones.(38)
Lo anterior es cónsono con expresiones previas de este Tribunal sobre los beneficios de recurrir a la normativa de *51 Delaware para analizar nuestros esquemas estatutarios sobre derecho corporativo. En D.A.Co. v. Alturas Fl. Dev. Corp. y otro,(39) reconocimos que la Ley General de Corpo-raciones de 1956 entonces vigente se fundamentaba en la Ley General de Corporaciones del estado de Delaware y, por eso, otorgamos valor ilustrativo y persuasivo a las in-terpretaciones que los tribunales del estado de Delaware, al igual que otras jurisdicciones, hayan dado a las seccio-nes correspondientes de la Ley General de Corporaciones de ese estado.(40) Se trata de un desarrollo normativo en el derecho de corporaciones en Puerto Rico que por más de cincuenta años ha emulado la normativa de Delaware.(41)
A. Conforme al mandato legislativo y nuestra juris-prudencia, examinemos la jurisprudencia interpretativa de los tribunales de Delaware. Al hacerlo, nos detendremos no sólo en las decisiones del Tribunal Supremo de esa ju-risdicción, sino en las de los Courts of Chancery, que son tribunales de equidad a los cuales la Ley de Corporaciones de Delaware les encomienda atender los casos al amparo de su Sección 273, análoga a nuestro Artículo 9.03.(42) El Tribunal Supremo de Delaware ha analizado la figura de la empresa común en dos casos principales: J. Leo Johnson v. Carmer,(43) resuelto en 1959, y Warren v. Goldfinger, Inc., *52 resuelto en 1980.(44) En J. Leo Johnson v. Carmer, el Tribunal Supremo de Delaware ofreció la definición inicial si-guiente:
Generally, courts have not laid down any very certain definition of what constitutes a joint adventure, nor have they established very fixed or certain boundaries thereof, contenting themselves in determining whether the facts of a particular case constitute the relationship of joint adventure. ... A joint adventure has been broadly defined as an enterprise undertaken by several persons jointly to carry out a single business enterprise .... (Énfasis nuestro.)(45)
De lo anterior surgen dos asuntos de interés. En primer lugar, lo difícil que ha sido definir de manera concreta y precisa qué es una empresa común. En segundo lugar, que el Tribunal Supremo de Delaware emplea la misma defini-ción que da el tratadista Rowley, fuente principal utilizada en Planned Credit. Ya hemos visto que, según Rowley, un “single business enterprise” o empresa dedicada a un solo negocio no necesariamente se limita a una sola transacción comercial.
En Warren, el Tribunal Supremo de Delaware, cons-ciente de la insuficiencia de la definición adoptada en J. Leo Johnson, adoptó unos criterios para determinar si se está ante una empresa común. Estos son:
(1) Una comunidad de intereses en el cumplimiento de un propósito común;
(2) Control o derecho de control conjunto;
(3) Un interés propietario conjunto sobre el asunto sus-tantivo;
(4) Un derecho a compartir las ganancias;
(5) Un deber de compartir las pérdidas en las que se pueda incurrir. (46)
*53 Además del Tribunal Supremo del estado, los “Courts of Chancery” de Delaware han publicado opiniones de valor persuasivo en torno a la empresa común, interpretando y aplicando los pronunciamientos del Tribunal Supremo en J. Leo Johnson y Warren. Precisamente, muchos de los ca-sos relacionados a esta figura se dan en el contexto de pe-ticiones de disolución al amparo de la Sección 273 de la Ley General de Corporaciones de Delaware, análoga a nuestro Artículo 9.03, en los cuales deben intervenir, por mandato legislativo, estos tribunales de equidad.
Al igual que en Puerto Rico, en Delaware la figura de la empresa común, originalmente, estaba fuera del modelo corporativo. En Sheppard v. Carey,(47) resuelto en 1969, el tribunal definió la empresa común no corporativa de la manera siguiente:
A joint venture is an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, but without creating a partnership in the legal or technical sense of the term, or a corporation, and they agree that there shall be a community of interest among them as to the purpose of the undertaking. (Énfasis suplido.)(48)
De lo anterior surgen tres asuntos. En primer lugar, se descarta la definición estrecha de “una sola transacción” para caracterizar la empresa común y se repite el concepto “la empresa de un solo negocio” (“single business enterprise”). En segundo lugar, se reafirma que las defini-ciones iniciales de la figura de la empresa común se refe-rían a ésta en su modalidad no corporativa, por lo cual resultan insuficientes para definir a la empresa común que asume la forma corporativa. Por último, la definición adop-tada en Sheppard v. Carey reafirma que la característica principal de la empresa común es la precisión y especifici- *54 dad respecto al tipo de gestión comercial que llevaría a cabo, en contraposición a una entidad que no tiene un ob-jetivo específico en su operación. Esta descripción de la em-presa común como una entidad con una vida dinámica y compleja, que trasciende la mera transacción única, ha sido desarrollada por los tribunales de equidad de Delaware.(49) De acuerdo con estas decisiones, la determi-nación de si una entidad particular es una empresa común dependerá de los hechos relacionados a su funcionamiento y no de que en el certificado de incorporación se haya men-cionado que, en efecto, se estaba estableciendo una em-presa común. (50) De igual forma, como hemos visto, lo que se requiere según nuestro Artículo 9.03 es que la corpora-ción se dedique a una empresa común, no que haya sido incorporada para esos fines.
En Wah Chang & Ref. Co. of Am. v. Cleveland Tungstan Inc.,(51) el Court of Chancery se enfrentó a un caso similar al de autos. Insistiendo en la naturaleza expedita del pro-ceso de disolución al amparo de la Sección 273, el tribunal reconoció que no había una definición estatutaria del con-cepto “empresa común” y que la amplia definición ofrecida por el Tribunal Supremo de Delaware en J. Leo Johnson y Warren requería un análisis caso a caso para determinar si una entidad en particular era una empresa común.(52) En Wah Chang, la parte demandada alegó, de manera idéntica a la peticionaria en el caso de autos, que a la empresa cuya liquidación se solicitó no le aplicaba la Sección 273 porque operaba de manera continua. En particular, igual que en *55 nuestro caso, allí se argumentó que, si se resolvía que una empresa de operación continua y compleja podía ser cata-logada como una empresa común, virtualmente toda em-presa compuesta por dos accionistas por partes iguales se-ría una empresa común, restándole eficacia a dicha figura. (53) El Tribunal de Wah Chang rechazó esa argumen-tación. (54)
En conclusión, la normativa de Delaware en torno a lo que constituye una empresa común es compatible con nuestras expresiones en Planned Credit, según las clarifi-camos hoy. Aunque se trata de una figura que no permite una definición exacta, se requiere, como mínimo, una defi-nición que cubra una gama amplia de gestiones comer-ciales.(55) Para ello debemos analizar cómo se ha atendido *56 el proceso de disolución de estas empresas en Delaware y cómo ha evolucionado la figura de la empresa común, par-ticularmente cuando se adopta una forma corporativa.
B. El Tribunal Supremo de Delaware ha sido parco en sus expresiones sobre el proceso de disolución establecido en la Sección 273 de la Ley de Corporaciones de ese estado, que es análogo al proceso reglado en el Artículo 9.03 de nuestra Ley General de Corporaciones. Más bien, se ha dejado el desarrollo de la normativa, nuevamente, a los Courts of Chancery. En Giuricich v. Emtrol Corp.,(56) el alto foro de ese estado resolvió que el propósito de la Sección 273 es “crear un remedio más liberal y rápidamente dispo-nible en situaciones de tranques entre accionistas [en cor-poraciones compuestas por dos accionistas en partes iguales]”. (Traducción nuestra.)(57) El Tribunal resolvió que no hacía falta demostrar que no ordenar la disolución de la corporación causaría un daño irreparable. Es decir, pautó una regla general que favorece la aplicación de la Sección 273 y la disolución de corporaciones que cumplan con sus requisitos.
Los Courts of Chancery de Delaware han suplido la nor-mativa específica sobre la aplicación de la Sección 273 den-tro del marco de las expresiones amplias del Tribunal Supremo de esa jurisdicción. Como vimos, son cuatro los requisitos para disolver una corporación según la Sección 273: que se trate de una corporación organizada con arre-glo a las leyes de la jurisdicción; que ésta esté compuesta por dos accionistas por partes iguales; que se dedique al logro de una empresa común y que exista una desavenen-cia entre los accionistas sobre la deseabilidad de desconti-nuar la empresa común. De éstos, los que más discusión han generado han sido los requisitos relacionados con los elementos esenciales de la empresa común y el control *57 equitativo por los accionistas, en parte, porque es relativa-mente fácil demostrar que la corporación fue organizada con arreglo a las leyes de la jurisdicción y que hay desave-nencia entre los accionistas.(58) También ha sido objeto de discusión el nivel de discreción que tiene un Tribunal para rehusar aplicar la Sección 273, así como las defensas dis-ponibles tanto a la corporación cuya disolución se solicita como al accionista que se opone a la disolución. (59)
La Sección 273 de la Ley de Corporaciones de Delaware, al igual que nuestro Artículo 9.03, dispone que, una vez cumplidos los requisitos allí establecidos, el tribunal “po-drá” ordenar la disolución de la corporación. Los tribunales de Delaware han interpretado que de esa forma se les otorga discreción para, en determinados casos, rechazar una petición de disolución. (60) Ahora bien, tal discreción es altamente limitada y estrecha.(61) Es decir, como regla general, una vez cumplidos los cuatro requisitos establecidos, lo que procede al amparo de la ley de Delaware es ordenar *58 la disolución de la corporación. Además, esta discreción judicial está estrechamente atada a las defensas que pueden invocar el accionista demandado o la propia corporación que es eje de controversia, defensas que también están fuertemente limitadas.
En In re Magnolia Clinical Research, Inc.,(62) para evi-tar la disolución de la corporación, el accionista deman-dado alegó varias defensas muy similares a las presenta-das en el caso de autos. En particular, alegó que el peticionario había presentado la solicitud de disolución para beneficiarse personalmente de unas oportunidades de negocio que le hubiesen correspondido a la corporación en caso de que ésta no se disolviese. También alegó que el peticionario había faltado a su deber de fiducia para con la corporación. Ninguna de las defensas prosperó porque el accionista tenía a su haber la posibilidad de demandar al peticionario en daños por esas causas. El tribunal resolvió que las defensas alegadas no impedían la disolución corpo-rativa al amparo de la Sección 273. A igual conclusión se llegó en In re Data Processing Consultants, Ltd., donde se reconoció, además, que el fraude o la ilegalidad sí pueden derrotar la petición de disolución. (63) De igual forma, en In re McKinney-Ringham Corp., supra, se limitó el requeri-miento de buena fe en la petición de disolución a que se tratara de una solicitud bona fide, es decir, que el peticio-nario verdaderamente quiera la disolución y no utilice la petición como una táctica para obtener concesiones del de-mandado o molestarlo.(64)
*59 En conclusión, vemos en la Sección 273 de la Ley de Corporaciones de Delaware un mecanismo expedito para la disolución de una corporación compuesta por dos accionis-tas por partes iguales. También podemos observar en la jurisprudencia y decisiones de los tribunales de esa juris-dicción una fuerte tendencia a favor de ampliar la defini-ción de “empresa común” para cubrir, no solamente las en-tidades dedicadas a una sola transacción, sino las empresas continuas de uno o varios negocios. De igual forma, se deduce que una vez se presenta la petición de disolución y se cumplen los requisitos establecidos por ley, el tribunal debe ordenar la disolución de la corporación, excepto en casos de fraude o ilegalidad. Por ello, las defen-sas de una falta al deber de fiducia o que la intención del demandante sea aprovecharse personalmente de oportuni-dades de negocios que de otra manera le corresponderían a la corporación, aunque pueden dar base a reclamaciones civiles válidas, son impertinentes a la demanda de disolu-ción y deben dilucidarse en un procedimiento civil ordina-rio e independiente.
C. Hasta aquí nos ha traído el repaso de la ley y la jurisprudencia del estado de Delaware que hemos hecho en cumplimiento con el mandato legislativo. Hemos consta-tado que el desarrollo de la “empresa común” en esa juris-dicción ha evolucionado de un origen informal en el que se asemejaba a la figura de la sociedad, a una versión de la figura jurídica de la corporación. Este desarrollo ha inci-dido en la definición de este concepto y de sus elementos constitutivos. A la luz de dicho desarrollo, la definición que podemos llamar “clásica” de la empresa común, además de servir de guía, resulta una definición mínima de esa figura en el contexto corporativo. En segundo lugar, es menester señalar que aun esa definición mínima rechaza la visión estrecha de la empresa común como una entidad dedicada únicamente a lograr una sola transacción comercial.
Examinemos ahora brevemente cómo los tratadistas del *60 derecho de corporaciones norteamericano han atendido esta figura, tanto en su versión no corporativa como en la corporativa. El tratadista Fletcher limita su discusión a la versión no corporativa de la empresa común. Lo que es más, establece que ésta es incompatible con la corporación.(65) No obstante, aun en el marco de esta mo-dalidad limitada de la empresa común, Fletcher no la li-mita a “una sola transacción”, sino que la describe como una “empresa única”.(66) Otros tratadistas reconocen que, si bien la figura de la empresa común era incompatible en sus orígenes con la forma corporativa, eso ha cambiado:
A rather modern device is a joint venture whose members are two or more business enterprises, corporate or otherwise. Many of these have been formed in the oil, chemical, electronic, and atomic fields. The resulting enterprise — although loosely called a joint venture might be incorporated. In such a case the resulting enterprise is a corporation, governed by corporation law, called a ‘joint venture corporation’. (Enfasis suplido.)(67)
O’Neal y Thompson discuten este desarrollo corporativo de la figura de la empresa común. Al igual que los trata-distas Henn y Alexander, éstos explican que el propósito de la empresa común corporativa originalmente era el permi-tir que una persona natural y una persona jurídica pudie-ran embarcarse en una actividad comercial específica de manera conjunta.(68) También sirvió para permitir que se pudiesen llevar a cabo proyectos que conllevasen grandes inversiones así como riesgos elevados de pérdidas y *61 fracaso. En estos casos, se recurría a esta figura como me-canismo para compartir gastos y distribuir el riesgo entre los participantes.(69) En particular, O’Neal y Thompson ha-cen hincapié en la diferencia entre la empresa común no corporativa y aquella que adopta la forma de corporación:
[T]he term “joint venture corporation” is somewhat misleading because the operations have a permanency and are conducted with a formality not generally associated with joint ventures as that term is often used in the context of unincorporated business associations.(70)
Finalmente, O’Neal y Thompson explican la interacción entre la empresa común, la transacción única y la empresa de un solo negocio:
Ajoint venture is usually said to be limited to a single transaction or a series of transactions; but, if the undertaking on which the joint adventurers embark is an extensive one, the venture may continue for a number of years. (Enfasis suplido.)(71)
Es decir, estos tratadistas descartan también la visión estrecha de la empresa común como una entidad de natu-raleza sencilla que únicamente se dedica a una sola tran-sacción comercial y que conlleva, necesariamente, una du-ración ínfima.
> I — I
A. Ante los desarrollos normativos y doctrinales que se han producido desde nuestra decisión en Planned Credit, particularmente la adopción de la Ley General de Corporaciones de 1995, estamos obligados a profundizar en nuestra interpretación de la figura de la empresa común, *62 ahora en su modalidad corporativa. Por un lado, la defini-ción de Planned Credit, según la hemos explicado en esta Opinión, resulta insuficiente para abarcar la totalidad de las entidades cubiertas por el Artículo 9.03. Pero, por otro lado, constituye el mínimo sustantivo de dicha definición. Por lo tanto, resolvemos que, como mínimo, una empresa común es aquella que se dedica a un solo negocio, que, si bien puede tratarse de una sola transacción comercial, no necesariamente tiene que serlo. Más aún, el concepto “un solo negocio” debe interpretarse de manera amplia y se re-fiere más bien a que la empresa tiene que dedicarse a un negocio específico y definido, independientemente de su complejidad o duración.
Para determinar si están ante una empresa común en el contexto particular del Artículo 9.03 de la Ley General de Corporaciones, los tribunales deberán analizar la situación a la luz de los factores siguientes:
(1) Si existe una comunidad de intereses en el cumpli-miento de un propósito común.
(2) Si hay un control o derecho de control conjunto.
(3) Si hay un interés propietario conjunto sobre el asunto sustantivo, es decir, que ambos accionistas aporten, ya sea con su industria, capital o de alguna otra manera, al logro del fin común.
(4) Si existe el derecho a compartir las ganancias.
(5) Si existe el deber de compartir las pérdidas en las que se pueda incurrir.
Por otra parte, la clasificación de una corporación como empresa común no dependerá necesariamente de lo que disponga su certificado de incorporación. Por el contra-rio, se trata de una determinación de derecho que depen-derá de la evidencia que se someta en el caso particular. Lo fundamental será si dicha corporación en realidad se de-dica a urna empresa común, no si se incorporó a esos fines. Dado que la definición que adoptamos hoy es amplia y ge *63 neral, la determinación de si una corporación en particular se dedica a lograr una empresa común requerirá un análi-sis caso a caso.
En la situación particular de una petición de disolución al amparo del Artículo 9.03, el elemento fundamental por considerar será si se trata de una corporación compuesta por dos accionistas por partes iguales. De ser así, se analizará de manera liberal si el objetivo comercial de la entidad es el logro de una empresa común. Si este análisis lleva a concluir que no se está ante una empresa común, los tribunales de instancia deberán resolver la controversia al amparo de nuestras expresiones en Epstein. Si se concluye que, efectivamente, se trata de una empresa común, resolverán acorde al Artículo 9.03 de la Ley General de Corporaciones.
B. El Artículo 9.03 establece los cuatro requisitos que deben cumplirse para disolver una corporación que se dedica al logro de una empresa común. Una vez se cerciore que la corporación cuya disolución se solicita efectivamente es una empresa común y que se cumplen los demás requisitos, el tribunal ordenará la disolución de la entidad corporativa. La discreción de los tribunales para negarse a dictar dicha orden es extremadamente limitada. Si la parte demandada, ya sea el otro accionista o la propia corporación, reclama que el accionista peticionario ha faltado a sus deberes de fiducia, que responde en daños ante la corporación o incluso que solicita la disolución para adelantar sus propios intereses comerciales, ello será impertinente al proceso según el Artículo 9.03. El Tribunal de Primera Instancia solamente deberá asegurarse que la solicitud de disolución sea bona fide, es decir, que realmente se pretenda la disolución.(72) Una vez llega a esa *64 conclusión, si se cumplen los demás elementos del Artículo 9.03, el tribunal ordenará la disolución de la corporación.
En el caso de autos, no hay controversia de que P.G.D. es una corporación organizada con arreglo a las leyes de Puerto Rico y está compuesta por dos accionistas, titulares cada uno del 50 por ciento de las acciones. De igual forma, no hay controversia en cuanto al hecho de la desavenencia entre los accionistas; la causa de ésta es inmaterial. Ade-más, no hay controversia en cuanto a que el peticionario es sincero en su deseo de disolver la corporación de la que es accionista. Finalmente, tampoco hay controversia de que P.G.D. se dedica únicamente a la venta y distribución de medicamentos genéricos. Es decir, es una corporación de-dicada a lograr una empresa común.
Al no haber controversia real sobre los hechos materia-les, entiéndase, sobre los elementos dispuestos por el Artí-culo 9.03 de la Ley General de Corporaciones, lo que co-rresponde es ordenar la disolución de la corporación demandada y continuar con el procedimiento establecido en dicho artículo. Por eso, no erró el Tribunal de Apelacio-nes al revocar al foro de instancia y dictar sentencia suma-ria disolviendo la corporación. (73)
*65 Por las razones anteriormente expuestas, se confirma la Sentencia del Tribunal de Apelaciones y se devuelve el caso al Tribunal de Primera Instancia para la continuación de los procedimientos compatibles con esta opinión.

Se dictará sentencia de conformidad.

El Juez Asociado Señor Martínez Torres emitió una opi-nión disidente, a la cual se unió el Juez Asociado Señor Feliberti Cintrón. La Juez Asociada Señora Pabón Char-neco no interviene.

 Igualmente presentó, como exige el Artículo 9.03 (14 L.P.R.A. see. 3003 (ed. 2008)) un Plan de Disolución Corporativa.

 Originalmente, la demanda fue presentada a nombre del señor Lloréns y de P.G.D. Posteriormente, el señor Lloréns solicitó que se enmendara la demanda para eliminar a P.G.D. como parte demandante y convertirla en parte demandada. Por su parte, P.G.D. solicitó intervención en el pleito, lo que fue autorizado por el foro de instancia.

 Lloréns también alega que esas desavenencias provocaron su renuncia como director y oficial de P.G.D.

 Como veremos, el Artículo 9.03 de la Ley General de Corporaciones, supra, únicamente aplica a corporaciones cuyos accionistas se dedican al logro de una em-presa común.

 Esta última controversia es exclusivamente de derecho y es una reafirmación de la alegación de la parte demandada de que el Artículo 9.03 no es aplicable, por lo cual sostiene que no se justifica la concesión de un remedio y procede la desestima-ción de la demanda.

 En particular, el foro de instancia hizo referencia a la disolución de una corporación compuesta por dos accionistas con igual cantidad de acciones, como re-medio en equidad reconocido en Epstein v. F. & F. Mortgage Corp., 106 D.P.R. 211 (1977).

 El foro intermedio no encontró controversia en cuanto a los hechos materia-les siguientes: (1) que la corporación está organizada con arreglo a las leyes del Estado Libre Asociado de Puerto Rico; (2) que tiene solo 2 accionistas, cada uno de los cuales posee el 50 por ciento de las acciones de ésta, y (3) que hay desavenencia en torno a la deseabilidad de continuar tal empresa común.

 El foro apelativo también recurrió a la jurisprudencia del estado de Delaware, de donde se importaron nuestra Ley General de Corporaciones de 1995 y los elementos allí identificados de lo que constituye una empresa común. Según el Tribunal de Apelaciones, la definición adoptada se asemeja más a los fallos de los tribunales de Delaware sobre qué constituye una empresa común. En particular, el foro apelativo notó que en dicha jurisdicción se ha rechazado la interpretación de que un “joint venture” se limita a una sola transacción comercial.

 Planned Credit of P.R., Inc. v. Page, 103 D.P.R. 245 (1975).

 Sentencia del Tribunal de Apelaciones, pág. 12, Caso Núm. CC-2009-0497, Parte 3, Apéndice, pág. 1009.

 No obstante, no hay controversia alguna de que, en la práctica, P.G.D. se dedica única y exclusivamente a la venta y distribución de medicamentos genéricos. Todos los documentos presentados por ambas partes sostienen esta determinación.

 Como adelantáramos, este último hecho alegadamente en controversia es una reafirmación de la posición de Arribas y P.G.D. de que el Artículo 9.03 no le aplica a P.G.D.

ls) Incluso, Arribas presentó una demanda contra Lloréns por un alegado in-cumplimiento con su deber de fiducia que causó daños a P.G.D. KAC 2006-4735(901).

 Arribas y P.G.D. sostienen que, según la normativa de Delaware, este tipo de defensa se ha utilizado para declarar “sin lugar” una petición de disolución.

 De igual forma, se sostiene en que no estamos obligados por la definición adoptada en Planned Credit, pues éste se resolvió previo a la aprobación de la Ley-General de Corporaciones. Lloréns insiste en que debemos interpretar la figura de “empresa común” al palio de la normativa de Delaware, de donde se importó textual-mente nuestro Artículo 9.03. Según el recurrido, en Delaware se aplica la sección análoga al Artículo 9.03 a negocios en marcha y no meramente a entidades que llevan a cabo una sola transacción.

 Epstein v. F. & F. Mortgage Corp., 106 D.P.R. 211 (1977).

 14 L.P.R.A. see. 3003 (ed. 2008). La Ley General de Corporaciones de 2009, Ley Núm. 164 de 16 de diciembre de 2009 (14 L.RR.A. sees. 3501-4066), derogó la Ley General de Corporaciones de 1995. No obstante, en cuanto al proceso de disolu-ción de una corporación dedicada a una empresa común, la nueva ley de corporacio-nes preservó el mecanismo dispuesto en la ley anterior. Incluso, mantuvo su misma designación (Artículo 9.03 (14 L.RR.A. sec. 3703)). La única diferencia entre ambos artículos es la adición en la nueva ley de una frase introductoria en el Artículo 9.03 que permite a los accionistas pactar, ya sea en el certificado de incorporación o me-diante acuerdo escrito a esos efectos, que no será aplicable dicho artículo. Como veremos, este cambio responde al desarrollo de la normativa sobre derecho corpora-tivo en el estado de Delaware. Por lo tanto, la solución de esta controversia es idén-tica al amparo de la Ley General de Corporaciones de 1995 y de la de 2009.

 Hasta ahora, nuestra jurisprudencia no había discutido la interacción entre la figura de la empresa común y la disolución de una corporación compuesta por dos accionistas por partes iguales. Por el contrario, las habíamos analizado separada-mente: Planned Credit of P.R., Inc. v. Page, supra (empresa común), y Epstein v. F & F Mortgage Corp., supra (disolución de una corporación compuesta por dos accionistas).

 A partir de 1995 y para efectos del Artículo 9.03, la Asamblea Legislativa dio forma corporativa al concepto empresa común. Esta distinción es significativa, ya que el análisis en Planned Credit se basó en que la figura de la sociedad es más formal que la de la empresa común. Pero, al recibir forma corporativa en la Ley General de Corporaciones de 1995, la “empresa común corporativa” asumió una es-tructura jurídica con mayores formalidades y protecciones que la sociedad. Por lo tanto, no podemos confundir la empresa común en su forma no corporativa con la empresa común que asume la forma corporativa al amparo de la Ley General de Corporaciones.

 íd., págs. 250-251.

 2 Rowley on Partnership (1960).

 Id., Sec. 52.2, pág. 464. “The relationship of a joint adventure ‘does not readily admit a short and satisfactory definition’. The determination of the existence of a joint adventure must depend in each case on its particular facts. ... Numerous definitions of a joint adventure have nevertheless been promulgated.” (Escolios omitidos.) Lo que es más, Rowley explica que, precisamente, la principal fuente de controversias en casos de empresas comunes es si existe tal empresa. “In probably a majority of all reported cases and definitely a majority of the earlier cases concerned with joint adventures, the existence of the relationship was a matter disputed by the parties and determined by the court, or a conclusion by the court without any such claim by any of the parties.” Id., pág. 475.

Íd., Sec. 52.2, pág. 464.

 Planned Credit of P.R., Inc. v. Page, supra, pág. 250.

 Rowley on Partnership, supra, págs. 464-465.

 Íd., Sec. 52.8, pág. 475.

 Íd., Sec. 52.14, pág. 482.

 Íd., págs. 482-483. “The single transaction or venture that is the subject matter of the relationship may not be brief in duration. It may take years to terminate .... [T]he duration of the venture ... is ... seldom a given or stated period of time.”

 C.E. Díaz Olivo, Corporaciones, San Juan, Publicaciones Puertorriqueñas, 2005, págs. 248-249.

 Epstein v. F & F Mortage Corp., supra, pág. 217.

 Íd., pág. 221.

 L.M. Negrón Portillo, Derecho Corporativo Puertorriqueño, 2da ed., Ed. Situm, 1996, pág. 396.

 En particular, tras haberse aclarado que nuestras expresiones en Planned Credit no limitaron la figura de la empresa común, incluso en su forma no corpora-tiva, a una sola transacción comercial.

 8 Del. C. Sec. 273. Dicha sección dispone, en lo pertinente, como sigue:

“Dissolution of joint venture corporation having 2 stockholders

“(a) If the stockholders of a corporation of this State, having only 2 stockholders each of which own[s] 50% of the stock therein, shall be engaged in the prosecution of a joint venture and if such stockholders shall be unable to agree upon the desirability of discontinuing such joint venture and disposing of the assets used in such venture, either stockholder may, unless otherwise provided in the certificate of incorporation or in a written agreement between the stockholders, file with the Court of Chancery a petition stating that it desires to discontinue such joint venture and to dispose of the assets used in such venture in accordance with a plan to be agreed upon by both stockholders or that, if no such plan shall be agreed upon by both stockholders, the corporation be dissolved.” (Énfasis suplido.)

 Comisión de Reformas Gubernamentales del Senado de Puerto Rico, In-forme sobre el P. del S. 1122 de 9 de junio de 1995, pág. 9. El informe expresó: “El Proyecto sigue de cerca la legislación corporativa del estado de Delaware que, a *50 través de los años se ha caracterizado por contar con una legislación corporativa abarcadora y de avanzada.” Id., pág. 8.

 Íd., pág. 11. Esto es cónsono con la intención legislativa en cuanto a la Ley General de Corporaciones en su totalidad: “[U]no de sus objetivos principales [es] facilitar el tráfico mercantil.” íd., pág. 8.

 Véase Informe de la Comisión de Gobierno del Senado de Puerto Rico sobre el P. del S. 124 de 30 de septiembre de 2008. En dicho informe, se explica que la nueva Ley General de Corporaciones es producto de los cambios que sufrió la ley de corporaciones de Delaware.

 Íd., pág. 25.

 132 D.P.R. 905, 915 (1993).

 Íd., págs. 915-916, citando a Peña Clos v. Cartagena Ortiz, 114 D.P.R. 576, 588 (1983); Hernández Agosto v. López Nieves, 114 D.P.R. 601, 607 (1983); Pueblo v. Zavala, 78 D.P.R. 484, 488 (1955) y Corretjer v. Tribl. de Distrito, 72 D.P.R. 754, 760 (1951).

 Lo anterior no significa que quedemos obligados por la normativa de Delaware, ya sea estatutaria o jurisprudencial. Al fin y al cabo, la interpretación de las leyes en nuestra jurisdicción compete a este Tribunal. No obstante, en la medida en que dicha normativa sea persuasiva e ilustradora, y se acople a nuestra realidad, la acogeremos.

 La Ley General de Corporaciones de Delaware tampoco ofrece una defini-ción estatutaria de la figura de la empresa común. Las expresiones del Tribunal Supremo de Delaware son escasas, aunque, como veremos, altamente ilustrativas. Por lo tanto, recurriremos a éstas en primera instancia. En segunda instancia, ana-lizaremos algunas expresiones de los tribunales de equidad (Courts of Chancery).

 J. Leo Johnson v. Carmer, 156 A.2d 499 (1959).

 Warren v. Goldfinger, Inc., 414 A.2d 507 (1980).

 J. Leo Johnson v. Carmer, supra, pág. 584.

 Warren v. Goldfinger, Inc., supra, pág. 509: “(1) a community of interest in the performance of a common purpose, (2) joint control or right of control, (3) a joint proprietary interest in the subject matter, (4) a right to share in the profits, (5) a duty to share in the losses which may be sustained.”

 254 A.2d 260 (1969).

 Íd., pág. 262, citando a 30 Am. Jur., Sec. 2 Joint Adventures.

 In re Arthur Treacher’s Fish & Chips, 1980 Del. Ch. LEXIS 489 (1980, no publicada). “In addition, joint ventures have historically been concerned with more than just one business transaction, being for the most part involved in the acquisition and running of a complex business.” (Enfasis suplido.) Id., pág. 7. En este caso, se trataba de una empresa dedicada a la operación de varios restaurantes. El tribunal resolvió que se trataba de una empresa común.

 In re McKinney-Ringham Corp., 1998 Del. Ch. LEXIS 34 (1998), pág. 6.

 1996 Del. Ch. LEXIS 102.

 Íd., págs. 9-10.

 “Respondents argue that every close corporation with only two shareholders might be classified as a joint venture if the Court does not require ‘something more’ when finding that parties created a joint venture.” íd., pág. 12. La parte demandada argumentó que ese “algo más” era que la empresa se dedicara únicamente a un solo negocio (“single business”). En este caso, la corporación objeto de controversia se dedicaba a muchos negocios distintos (“several lines of business”).

 Lo que es más, el tribunal propuso que una correcta definición del concepto “single business entrerprise”, incluso, no se limita a una empresa que se dedique a un solo tipo de negocio. Por el contrario, el Court of Chancery resolvió que una empresa común podía dedicarse a múltiples tipos de negocios (“several fines of business”). íd., págs. 13-14. Este fallo es consecuencia del rechazo expreso del tribunal a la definición de empresa común como algo limitado a una sola transacción (“one business transaction”):
“Respondent’s attempt to persuade the Court that a joint venture may involve only one fine of business fails. No authority supports such a limited and narrow definition of a joint venture. The statute itself does not define joint venture, and it would be inappropriate to rewrite the statute to include such a limitation. Although the definition in J. Leo Johnson states that a joint venture involves a‘single business enterprise’, often joint ventures are highly intricate relationships that consist of ‘more than just one business transaction’ and often involve the acquisition and operation of a complex entity.” íd., pág. 14.
La lógica detrás de esta determinación es que, como la característica fundamental de la empresa común es que sus objetivos estén claramente definidos y precisa-dos, no importa la naturaleza de ese objetivo, su complejidad o multiplicidad. Esta visión no es compartida de manera unánime por los Courts ofChanceiy. No obstante, aquellos que han requerido “algo más” tampoco han adoptado definiciones tan estric-tas como las propuestas aquí. Véase In re Coffee Associates, Inc., 1993 Del. Ch. LEXIS 263 (1993).

 Por ejemplo, en In re Food Ingredients Int’l, Inc., 2010 Del. Ch. LEXIS 233 (2010), se resolvió que una corporación cuya operación principal era la importación, el procesamiento, la venta y la distribución de ingredientes y preparativos de comida era una empresa común.

 449 A.2d 232 (1982).

 Íd., pág. 238.

 Sobre este último, es evidente que, si uno de los accionistas pide la disolu-ción de la corporación y el otro se opone, existe una desavenencia entre éstos sobre la deseabilidad de continuar con la empresa común. Véase In re Venture Advisers, Inc., 1988 De. Ch. LEXIS 151 (1988).

 Cabe destacar que la interacción entre los requisitos de que la corporación se dedique a lograr una empresa común y que esté compuesta por dos accionistas por partes iguales ha desatado discusión en Delaware sobre cuál de éstos es el elemento fundamental para efectos de la Sección 273. Las expresiones de algunos Courts of Chancery dan a entender que el elemento esencial de esta sección es que la corpora-ción esté compuesta por dos accionistas por partes iguales y no que sea una empresa común. En ese sentido, se asemeja más a las situaciones que atendimos en Epstein. Véase In re Arthur Treacher’s Fish & Chips, supra, págs. 11-12. Véase, además, In re Delaware Bay Surgical Servs., 2002 Del. Ch. LEXIS 158 (2002). En este último caso, si bien se insiste en que es insuficiente demostrar que se trata de una corporación compuesta por dos accionistas por partes iguales, sin más —es decir, que hace falta que se dedique a lograr una empresa común— el Tribunal apunta hacia una defini-ción amplia de la empresa común e insiste en la importancia del control conjunto.

 Véanse: Fulk v. Wash Serv. Assocs., 2002 Del. Ch. LEXIS 78 (2002), pág. 32; In re Delaware Bay Surgical Servs., supra, pág. 7; In re Arthur Treacher’s Fish & Chips, 386 A.2d 1162, 1166 (1978).

 En In re McKinney-Ringham Corp., supra, el Court of Chancery hizo énfasis en que la Sección 273 establece un derecho estatutario a solicitar la disolución. Id., págs. 14-15. Por lo tanto, la discreción que ofrece la palabra “podrá” en cuanto a la facultad del tribunal de ordenar la disolución, debe construirse estrechamente (“very narrowly”). íd., pág. 16.

 2000 Del. Ch. LEXIS 5 (2000).

 1987 Del. Ch. LEXIS 519 (1987).

 “[T]he exercise of such discretion is limited to a determination of whether or not a bona fide inability to agree exists between the two shareholders ..., if it so finds, the petitioner is entitled to the relief provided by the statute .... [W]here the facts support a genuine dispute over the desirability of continuing the business enterprise as a joint venture, the inquiry ends.” (Énfasis suplido.) In re McKinney-Ringham Corp., supra, págs. 16-18.

 1 Fletcher Cyclopedia of the Law of Corporations Sec. 23, pág. 40 (“unincorporated business”); Vol. 8, Sec. 3997.10, pág. 349: “[A] joint venture may not be carried on by individuals through a corporate form; the two forms of business are mutually exclusive.”

 “Single enterprise.” íd., Vol. 1, Sec. 23 pág. 40.

 H.G. Henn y J.R. Alexander, Laws of Corporations, 3ra ed., St. Paul, West Publishing, 1983, Sec. 49, pág. 108.

 1 O’Neal and Thompson’s Close Corporations and LLCs: Law and Practice, Sec. 1:7, pág. 1-22 (2010). Véase Henn y Alexander, op. cit., pág. 108.

 O’Neal and Thompson’s, supra, pág. 1-23.

 Íd., págs. 1-23 a 1-24. En este sentido, nos dicen los tratadistas, una em-presa común no incorporada se asemeja a una sociedad, tal y como resolvimos en Planned Credit. Íd., esc. 13.

 Íd., esc. 13.

 De igual forma, no procederá la disolución si se demuestra la existencia de fraude o alguna otra ilegalidad.

 La Regla 36.1 de Procedimiento Civil de 2009 permite a la parte reclamante en una demanda solicitar que se dicte sentencia sumaria a su favor sobre la totalidad o cualquier parte de la reclamación. 32 L.P.R.A. Ap. V. Véase Ramos Pérez v. Univisión, 178 D.P.R. 200, 212 (2010). “La sentencia sumaria es un mecanismo procesal disponible para resolver controversias en donde no se requiere la celebración de un juicio.” Id., pág. 213. “La parte que promueve la sentencia sumaria debe establecer su derecho con claridad y demostrar que no existe controversia sustancial sobre algún hecho material.” Por su parte, “[u]n hecho material es aquel que puede afectar el resultado de la reclamación de acuerdo con el derecho sustantivo aplicable. Ade-más, la controversia sobre el hecho material tiene que ser real”. Id. Es decir, “cual-quier duda no es suficiente para derrotar una moción de sentencia sumaria”. Id., pág. 214.
La parte demandante puede prevalecer por la vía de sentencia sumaria “si presenta prueba incontrovertida sobre todos los elementos indispensables de su causa de acción”. (Énfasis suplido.) íd., pág. 27. En cambio, la parte demandada puede derrotar la moción de tres maneras diferentes: (1) si establece una controver-sia real de hechos sobre uno de los elementos de la causa de acción de la parte demandante; (2) si presenta prueba que apoye una defensa afirmativa, o (3) si pre-senta prueba que establezca una controversia sobre la credibilidad de los testimonios jurados que presentó la parte demandante.